Filed 9/8/16  C.T. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

C.T.,

      Petitioner,

v.

THE SUPERIOR COURT OF
RIVERSIDE COUNTY,

      Respondent;

RIVERSIDE COUNTY DEPARTMENT
OF PUBLIC SOCIAL SERVICES,

      Real Party in Interest;

M.W. et al.,

      Objectors.

E065968

(Super.Ct.No. SWJ010208)

O P I N I O N

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Matthew C.

Perantoni, Judge.  Petition denied.

David Goldstein for Petitioner.

1

No appearance for Respondent.

No appearance for Real Party in Interest.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento for Objectors.

On May 2, 2016, for the second time, the juvenile court terminated petitioner C.T.'s (Mother) reunification services as to minor C.S.T. (born in April 2009) (Minor) and set the Welfare and Institutions Code section 366.26 hearing.[1]  In the petition for extraordinary writ, Mother contends Real Party in Interest, Riverside County Department of Public Social Services (the department), failed to meet its burden of providing Mother with reasonable reunification services.  We affirm.

## I.  FACTS AND PROCEDURAL HISTORY[2]

Minor was born with a gastrointestinal defect that required, in addition to other surgeries, surgery to cut out a portion of the small bowel.  The resulting "short bowel syndrome" meant Minor had less bowel area available to absorb nutrients and had to be fed by "total parenteral nutrition" (TPN).  TPN is administered through a central line catheter in the chest.  This required close monitoring to avoid infections and to make sure Minor was getting enough nutrients and not losing weight.  Minor spent most of her first

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  By order dated May 26, 2016, we incorporated the record in case No. E064442 which, in turn, incorporated the records in case Nos. E064024 and E062455.  We derive much of the initial portion of our factual and procedural history from the opinion filed in case No. E062455 on March 11, 2015.

year of life at Loma Linda University Medical Center (LLUMC) and was released on March 2, 2010.

Between Los Angeles County and Riverside County, child protective services received referrals regarding Minor in March 2010, April 2010, twice in May 2010, and July 2010, all alleging general neglect. The following problems were reported: First, Mother participated in only three days of a five-day bedside training to enable her to carry out Minor's feeding regimen so that Minor could be discharged from a 10-month hospital stay into Mother's care. Second, Mother took Minor out of town to her boyfriend's home where they used and sold drugs, leaving Minor unattended and crying. Third, one day Mother told the nurse who came to the home each day to help feed Minor[3] that the family was leaving for the day; Mother promised to start the TPN in the nurse's stead; however, when the nurse returned the next day Minor had been fed only a small fraction of what she required. Mother reported she "forgot" to start the TPN and that Minor became very hungry. Minor became dehydrated and fevered from not receiving enough liquids; she was hospitalized. The referral further reflected that if Minor missed regular feedings, she could become dehydrated or septic, which could be life threatening. Fourth, Minor was hospitalized in April and again in May due to multiple infections near the site of the TPN line. In addition, the central line had been cut, which could have resulted in Minor's starvation.

---

[3] It appears from the record that Minor received the TPN feeding each day from 4:30 p.m. until noon the next day and that Minor was provided with in-home nursing care to assist with the TPN.

3

Fifth, after being told by doctors at LLUMC that Minor would need surgery to treat a bowel obstruction, Mother stated she wanted to seek a second opinion. However, Mother reportedly took Minor to the emergency room at both Cedars-Sinai and UCLA Medical Center to seek the second opinion, rather than making an appointment as LLUMC staff advised her to do. Medical staff at LLUMC were concerned that Minor was losing weight during the intervening time; Minor would be unable to withstand the surgery if she lost too much weight. The TPN line began to leak, so LLUMC personnel directed Mother to take Minor directly to the emergency room so Minor could be admitted and the source of the leak found. Mother failed to do so and both medical staff and the social worker were unable to contact Mother.

On July 23, 2010, the social worker went to Mother's home with a sheriff's deputy. After consulting with a supervisor and the on-call doctor at the hospital, who reported that "this has been an on-going problem with [Mother] not following through with appointments," Minor was placed into protective custody and the social worker arranged for Minor to be transported to the hospital by ambulance. Mother and her boyfriend initially refused to allow the paramedics into the home and resisted having Minor taken to the hospital. They then insisted Minor be transported to UCLA Medical Center. The boyfriend became quite agitated, and other people present at the property "began to make the situation more difficult and began interfering in the investigation . . . ." The deputy determined that the boyfriend had been arrested in May for a domestic violence incident with Mother at the home. Mother initially denied the incident, but later

4

stated that it was an argument that did not involve a physical altercation. It was later determined that Mother and her boyfriend were arrested together in February 2010 for drug possession. On July 28, 2010, the juvenile court detained Minor.

In the jurisdictional and dispositional report filed on September 17, 2010, the social worker reported Minor was doing well in her placement in the subacute unit at Community Hospital of San Bernardino. Mother acted appropriately while visiting Minor, who seemed to be comforted by Mother's presence. Mother appeared to have untreated mental health and dependent personality issues; from speaking with family members and medical staff, the social worker opined that Mother may have suffered past traumas. Hospital staff reported that Mother's boyfriend appeared to emotionally abuse Mother.

A doctor had concluded that Minor had "multiple diagnoses which may be life-threatening when her condition isn't stable," that Minor's condition had not been stable since she was initially sent home from the hospital in March, that Mother did not appear to be capable of stabilizing Minor at home despite training and in-home nursing assistance, and that Minor was considered medically fragile and would require a specialized foster home. A nurse, who was one of two primary caregivers for Minor in the neonatal intensive care unit at LLUMC and had become a family friend, asked that

5

she and her husband be considered for placement.[4]  The nurse detailed Minor's many surgeries, infections, diagnoses, and crises while in the hospital for 10 months.

At the jurisdictional and dispositional hearing held on September 22 and 23, 2010, the juvenile court sustained allegations that Mother failed to follow through with medical treatment for Minor, resulting in Minor being hospitalized, and that Mother and her boyfriend engaged in domestic violence in Minor's presence.  The court ordered reunification services for Mother, ordered that Mother participate in a psychological evaluation to determine whether she could provide appropriate care for Minor, and ordered the department to obtain a second opinion regarding the proposed surgery.

In the six-month review report filed on March 8, 2011, the social worker recommended continuing reunification services to Mother.  Mother had obtained a restraining order against her boyfriend after he was arrested for kidnapping and assaulting her.  The psychological evaluation resulted in a diagnosis of "mixed personality disorder which will impact her ability to care for a child with multiple medical needs."  Mother's arrest the previous year with her boyfriend for possessing drugs for sale resulted in felony charges that were still pending.

In January, Minor was placed with the nurse from LLUMC who had requested placement.[5]  Mother objected to having Minor immunized, so immunization was delayed

---

[4]  The nurse later became Minor's foster parent, de facto parent, legal guardian, and prospective adoptive mother (PAM).

[5]  The foster mother quit her position at LLUMC so she could provide 24-hour nursing care for Minor.

until the department obtained a court order. Minor remained medically fragile, was often sick because of infections and other complications, and was hospitalized three more times. The department sought and obtained a court order to have the surgery to which Mother had objected prior to the dependency.

Minor was developing normally and appeared to be happy when medically stable. Several people told the social worker that Mother was drinking heavily and doing drugs; Mother denied this, but did not show up for a hair follicle test. Medical staff reported that Mother would bring different men with her who appeared to be on drugs when she visited Minor in the subacute unit. Mother attended a parenting class, had completed the first part of the medically fragile training class, and attended individual counseling.

In the addendum report filed on May 2, 2011, the social worker reported that Mother had a negative hair follicle test for drugs. For this reason, the social worker recommended six more months of services, but expressed concerns regarding "the company the [M]other continues to keep around her." At the six-month review hearing on May 2, 2011, the juvenile court continued Mother's reunification services.

In the 12-month review report filed September 8, 2011, the social worker recommended six more months of reunification services for Mother. The social worker also recommended Mother begin unsupervised weekend visits once Mother completed one-on-one medically fragile classes with the Public Health Nurse (PHN), with the possibility of placing Minor with Mother on family maintenance if weekend visits and Mother's progress on the case plan went well. Her criminal case for drug possession was

still pending.  Mother had two negative hair follicle tests for drugs.  She completed her domestic violence classes, obtained her own housing, and stated she had no negative contact with her former boyfriend and did not even know his whereabouts.  Mother completed a parenting class and the first part of the medically fragile training class; she agreed to begin one-on-one sessions with the PHN.

Minor was developing normally for a two year old and appeared happy.  She was still suffering from infections, skin breakdown, leakage in her J-tube[6] and other complications of her medical condition, but had not been hospitalized during the reporting period.  The foster mother had a "good working relationship with [Mother] and want[ed] to see [M]other and [Minor] reunified if at all possible.  One of the reasons she [wa]s working so hard to provide the medical care and consistency that promotes steady progress [wa]s to ensure a more successful long-term reunification with a less taxing level of medical acuity [*sic*].  At present, the level of care is challenging for an RN, let alone a non-medical[ly trained] single mother."  The social worker, Mother, foster mother, and the PHN were working together closely to get Mother trained so she could transition to caring for Minor and her extensive medical problems.

Mother visited with Minor at the foster home two to four times per week and attended some doctor visits.  Mother refrained from bringing her friends to the foster home.  Mother was appropriate during her visits, although she was anxious to get Minor

---

[6] The J-tube is used for feeding a nutrition formula, and sometimes medication, directly into the intestines.

to eat regular food despite the occupational therapist's warnings against rushing this. Mother had completed most of her case plan and the focus was on getting her trained to care for Minor medically and completing a slow transition to ensure Mother was capable of caring for Minor. The concurrent plan was adoption by the foster mother.

At the 12-month review hearing on September 21, 2011, the court continued Mother's reunification services. The court authorized Mother to have unsupervised weekend and overnight visits once Mother completed her one-on-one medically fragile classes with the PHN.

In the status review report filed January 6, 2012, the social worker recommended returning Minor to Mother with family maintenance services (FMS). Mother stated she was taking an 18-month weekly drug awareness class as part of a plan to mitigate her felony charges. Mother was also working with a therapist on her mental health issues. She was making progress on training to care for Minor's medical needs, having completed one-on-one training with both the PHN and the foster mother. The paternal great-grandmother was being trained to provide backup babysitting for Minor. Minor was also making strides in her overall development and all parties were working to wean her from the TPN feedings. She was down to three days per week of 14-hour TPN, rather than every day, and was making stop-and-go progress in eating food; she was doing well at drinking water. Minor was not hospitalized during the reporting period.

As of the date of the report, the plan was to keep Minor with the foster mother for approximately three more months to get her onto regular food and off the TPN before

9

transitioning her to Mother's care. Minor had four successful, unsupervised, 12-hour visits with Mother on days when she did not have the TPN. Minor then had two successful overnight stays at Mother's home, at least one of which was during her TPN feeding.

On January 12, 2012, the foster mother filed a request to be declared a de facto parent. The court granted the request on May 17, 2012.

In the addendum report filed on March 26, 2012, the social worker continued to recommend Minor be returned to Mother with FMS, but warned that Mother would have to avoid domestic violence contacts with her previous boyfriend. Minor had mentioned that the boyfriend had come to see her and/or given her a Christmas present during an unsupervised visit at Mother's home in December 2011. According to police reports dated December 26 and 27, Mother reported the boyfriend had contacted and threatened her on several previous occasions, although she did not report this to the police until he came to her home on December 26, and again on December 27. Upon being arrested for violating a restraining order, the boyfriend stated that Mother and he were lovers, they had had dinner together on December 26, and he had spent the night at Mother's home on a previous occasion. One of mother's neighbors stated that she had seen the boyfriend at Mother's apartment several times since the end of October, and had seen him knocking on the doors and windows.

On May 2, 2012, the social worker filed an addendum report recommending Mother's reunification services be terminated and a section 366.26 hearing be set to

consider a permanent plan of legal guardianship. The attempt to wean Minor from the TPN was unsuccessful; Minor had started to lose weight. Minor had to have another surgery in March to fix the J-tube site. The TPN was resumed for 14 hours every day. This meant Minor would continue to require intense, continuous monitoring and care.

In addition, the social worker noted that while Mother was receiving extensive training in caring for Minor and Mother obviously loved Minor, Mother had to be cautioned to use judgment "when contemplating 'excursions' she wants to embark on" during unsupervised visits. The foster mother believed Mother showed poor judgment while Minor was recovering from surgery in March by taking Minor to the playroom for excessive amounts of time rather than letting Minor rest. In April, Mother volunteered to mix the TPN and connect it to the central line at the end of a supervised visit at the foster parents' home. The next morning the foster mother found that Mother had neglected to turn on the pump, so Minor did not receive any TPN all night.

After an unsupervised visit in April, Mother returned Minor with the central line improperly secured. This compromised the line's sterility and risked infection. This also risked having the line pulled out, which "could result in a major bleed out and is to be avoided at all costs." Mother was appropriately concerned and receptive to the foster mother's later reinforcement of proper care of the central line, but this episode caused concern in light of the extensive training Mother had already received.

The social worker filed a second addendum report on August 30, 2012, in which she renewed her previous recommendations. TPN was reduced from seven days per

11

week to five days.  The foster mother and social worker continued to be concerned regarding Mother's ability to care for Minor and her comprehension of the serious nature of Minor's condition.  Minor was hospitalized for four days in August when it was suspected she might have an infection in her central line.  Mother complained to the social worker that Minor had been hospitalized for "no apparent reason" and that it had been a waste of time.

Mother continued to tell the social worker that Minor was not an invalid and should spend more time going to dance classes, skating, and other outdoor activities.  Mother wanted Minor to have a portable TPN pump so she could go outside more.  The foster mother attempted this, but Minor would not tolerate the portable pump.  The social worker was concerned that Mother was placing Minor's social needs ahead of her medical needs.  During unsupervised visits, Mother was improperly bandaging Minor's J-tube in a way that was less cumbersome and increased Minor's mobility, but resulted in excessive leakage.  Previous leakage in the J-tube had necessitated the surgery in March 2012.

The court held the 18-month review hearing on September 5, 2012.  The court terminated Mother's reunification services and set a section 366.26 hearing.  The court ordered that Mother be informed of Minor's medical appointments and that she be allowed to attend; it authorized one supervised visit per week.

In a report filed October 24, 2012, the social worker recommended the dependency be terminated and Minor placed in legal guardianship.  Minor had reduced

12

TPN feedings to three days per week; in October, Minor began a trial routine without TPN. Minor received most of her nutrition through the J-tube and was beginning to eat some solid food three times per day. The previous problems with J-tube leakage had become minimal once unsupervised visits with Mother were ended. The social worker opined that Minor's success in therapy, aimed at helping her eat normally, had improved once the unsupervised visits with Mother stopped because Minor was in a consistent care environment where the foster mother enforced the rules. Minor continued to develop normally. Mother agreed to the proposed legal guardianship.

The social worker filed an addendum report on January 16, 2013. Minor's oral intake of nutrition had increased from 15 to 33 percent, which meant that the ration of her nutritional intake from the J-tube had been reduced to 67 percent. The social worker received information from several sources, including relatives, the foster parents, and Minor herself, that Mother was back with her former boyfriend, which Mother denied. The foster parents stated they were willing to adopt Minor if Mother could not change her behavior, but preferred legal guardianship at that time to give Mother the opportunity to make life changes and regain custody of Minor. The social worker recommended legal guardianship with the option to change to adoption in the future.

At the section 366.26 hearing held on January 28, 2013, the court selected legal guardianship with the foster parents as Minor's permanent plan, and terminated the dependency. The court ordered Mother to have visits as set forth in a mediation

agreement, which allowed Mother to have supervised visits for three hours every other Friday.

On September 12, 2014, the legal guardians filed a section 388 petition asking the court to allow them to adopt Minor. The legal guardians asserted three new bases for the order: (1) Minor would require ongoing medical care for the rest of her life; (2) after four years of dependency, Mother had failed to make changes in her life that would allow her to care for Minor; and (3) Mother not only continued to not understand Minor's medical needs, but denied that Minor had medical needs. The legal guardians asserted the requested change would be in Minor's best interest because Minor had thrived and her medical condition had improved during the time she had been in the care of the legal guardians; Minor needed long-term stability and a family that could provide for her medical needs on a permanent basis. In a declaration attached to the petition, the PAM described Minor's medical and personal progress in her care, Mother's failure to become capable of providing for Minor's complex medical needs after four years of dependency, and the legal guardians' desire to adopt Minor.

At the hearing on the petition held on November 24, 2014, the juvenile court granted the petition, finding "that there is a change of circumstances, in that the legal guardians seek to adopt, and based upon the situation as described with [Minor] and the [M]other and the legal guardian, those change of circumstances would make it in the best interest of [Minor] to grant the motion to set the [section] [366].26 hearing." The court

14

reinstated the dependency and set a section 366.26 hearing for March 24, 2015. It additionally authorized bonding studies of the legal guardians and Mother.

Mother filed a petition for extraordinary writ in which she contended that the juvenile court abused its discretion in even granting a hearing on the legal guardians' section 388 petition because it did not establish a prima facie case for changed circumstances. We denied the petition by opinion dated March 11, 2015, holding that the legal guardians' declaration that they now wished to adopt Minor, in and of itself, established a changed circumstance and that the record as a whole reflected adoption would be in Minor's best interest.

In an addendum report filed January 29, 2015,[7] the social worker recommended the legal guardians be considered Minor's prospective adoptive parents (PAPs). In the section 366.26 report filed March 12, 2015, the social worker recommended Mother's parental rights be terminated and that the permanent plan for Minor be considered adoption by the PAPs. Minor had been off J-tube feedings since February 20, 2013. Minor's most recent doctor visit occurred on December 9, 2014, when it was found that Minor had lost weight. Nonetheless, the doctor had deemed Minor to be "'stable'" and authorized the guardians to continue feeding Minor without the J-tube. However, the doctor would not order surgical closure of the tube opening until absolutely certain Minor would be able to maintain weight and nutrition. Although no longer in use, the J-tube opening "still produce[d] considerable leakage that require[d] consistent wound/ostomy

---

[7] The report was not included in the record in the petition for extraordinary writ.

care and dressing changes; 3-4 times daily, to maintain skin integrity as well as all other cares relative to" protection of the tube.

Mother continued to engage in consistent, supervised visitation with Minor. Minor and Mother both appeared to enjoy the visits and Minor transitioned easily before and after visits. The social worker noted that although Minor knew who her biological Mother was, it was the PAPs who had cared for and provided Minor appropriate medical care, safety, stability, and love since placed with them on January 10, 2011.

An addendum report filed on March 13, 2015, included an adoption assessment. Minor indicated she liked living with the PAPs "because they make her happy and take really good care of her"; she wished to live with them permanently. Minor referred to the PAPs as her "parents" and said she loved them. The social worker concluded that the PAPs had a parental bond with Minor.

On March 23, 2015, Mother filed a section 388 petition requesting termination of the legal guardianship and placement of Minor with Mother with FMS.[8] Mother cited as changed circumstances that Minor's medical condition had improved and her therapeutic needs had decreased. Mother asserted the requested change was in Minor's best interest because the two had a strong bond and Mother was now ready to resume parental responsibility for Minor.

---

[8] Mother's counsel later apparently orally amended the request to reduce it to reinstatement of reunification services, though this request is only alluded to and not expressly reflected in the record.

On March 24, 2015, the PAPs' attorney filed the seven-page report of the bonding study between Minor and the PAPs. The psychologist noted it was "clearly evident" that Minor was deeply attached to the PAM. When asked if she were all alone, whom would be the one person she would have with her, Minor instantly responded, the PAM. When presented a picture of a mansion and asked with whom she would live with in it, she responded, the PAPs. When asked whom she would have fulfill a variety of caregiving responsibilities, Minor responded, the PAPs.

The psychologist concluded that Minor's family life with the PAPs was "a fundamental part of her psychological self-structure." "To this extent, it likely would be profoundly detrimental to her development and future well-being if [Minor]'s relationship with [the PAPs] were disrupted in any significant manner—certainly if she were removed from their home. Indeed, to sunder the primary child-parent relationship has been shown to contort the child's perception of and relationship to self, other[s] and the world, potentially crippling confidence, compassion, competence, and multiple spheres of functioning over the course of the lifetime." On April 24, 2015, the PAPs' attorney filed opposition to Mother's section 388 petition.

On May 12, 2015, the social worker filed an addendum report in which she again recommended the court terminate Mother's parental rights with a permanent plan of adoption by the PAPs. The social worker disagreed with Mother's section 388 request "as it is not in the best interest of [Minor] . . . to be uprooted from the only home that she has known for the past 4 1/2 years of her life, simply because her medical needs have

17

improved." Minor's then current physician noted that Minor's J-tube needed to be kept in place and that Minor would "benefit greatly from a stable and supportive home environment for her medical needs."

On May 27, 2015, Mother filed a report of the bonding study between Mother and Minor which had been completed on April 29, 2015. The licensed clinical social worker (LCSW) who conducted the study noted that Minor "does have a strong bond with her [M]other. [Minor] refers to [Mother] as mom and mommy." Minor looked forward to visitation with Mother and enjoyed interactions with her. The LCSW concluded: "Breaking the bond and moving forward can be problematic for a child that has such an awareness and strong bond with [Mother] . . . . This could create some emotional damage to [Minor]. Breaking this bond with the [M]other could hurt the child's self-esteem, confidence[,] and overall functioning. [¶] Possibly, the court would consider having the children remain in Legal Guardianship."

On July 8, 9, and 13, and September 8, 9, 10, and 11, 2015,[9] the court held hearings on Mother's section 388 petition. The LCSW testified Mother and Minor had a "strong bond." Minor referred to Mother as "'Mom'" or "'Mommy.'" Minor also called the PAM "Mom." The LCSW opined there was a parent/child relationship between Mother and Minor.

---

[9] On July 15, 2015, R.C. (Father) filed an appeal from a nonexistent order dated May 27, 2015. We designated the appeal case No. E064024. On September 25, 2015, Father's counsel filed an opening brief claiming no error or defect in the appealed "ruling." After offering Father the opportunity to file a supplemental brief, which he did not do, we dismissed the appeal as abandoned.

18

The psychologist who performed the bonding study between Minor and the PAPs testified. When asked to draw pictures of her family, Minor drew only a picture of the PAM; she did not draw a picture of Mother. When asked to pick out members of her family who are important to her, Minor picked the PAPs; she did not identify Mother. When asked to draw a picture of anyone doing anything, Minor drew a picture of herself, the PAPs, and their pets; she did not draw Mother. The psychologist asked Minor why she was not in Mother's custody; Minor responded it was because Mother was unable to care for her. When asked if Minor would want to return to Mother if Mother became capable of caring for Minor, Minor responded that she wanted to remain with the PAPs.

The psychologist opined that the PAM "unequivocally is the primary attachment figure for" Minor: "Every single data point that I have is consistent with that opinion." A primary attachment is "a singularly unique relationship, whereby the minor sees that particular individual as the central caring person in their lives." He asserted that the PAPs and Minor "were magically attuned to each other." The attachment between Minor and the prospective adoptive father was "[w]arm, loving, caring, engaged." Any disruption in the relationship between the PAM and Minor could be detrimental to Minor. Minor did refer to Mother as "Mom" or "Mommy."

Mother testified she now had an 850-square-foot apartment of her own in Pomona[10] and was studying nutrition at a local junior college. She consistently visited

---

[10] Mother's petition alleged she lived in a 2,400-square-foot home which she shared with a married couple. Mother testified that at the time of the filing of her petition, she had two separate residences, one in West Covina and one in Hacienda

*[footnote continued on next page]*

Minor during Minor's hospitalizations. Mother consistently visited with Minor when permitted after Minor's release from the hospital, including overnight and weekend visits. Minor refers to Mother as "Mommy" or "Mama." Mother is bonded to Minor. Minor is affectionate with Mother, climbing into her lap and kissing her during every visit. Minor has expressed a desire to go home with Mother.

Father met Minor's sister at Mother's apartment the preceding weekend.[11] Mother had contacted him in October 2014, and since then, over the course of a hundred telephone calls, they had discussed having him become involved in Minor's life. Mother had not enrolled in any domestic violence classes between August 2014 and the date of the hearing.

If granted reunification services again, Mother would "make rational decisions not out of fear, so with regards to [Minor's] medical care, it would be prompt, but also improved communication has been practiced and learned." Mother also had "a stronger

_____

*[footnote continued from previous page]*
Heights. Mother's driver's license reflected a fourth address, which she testified was her mailing address.

[11] At the time of our initial opinion, the alleged father had never expressed any interest in supporting Minor and was never raised to the status of a presumed father. Thus, he was mentioned only because he had filed a request for joinder to Mother's writ petition. Since that time, it was discovered that Father had been incarcerated in a federal prison in Florida. After his release from federal prison, Father was transferred to jail in California, where he was charged with assault by means of force likely to produce great bodily injury, criminal threats, and assault with intent to commit rape against Mother. Father filed a request to be considered a parent pursuant to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849, which the court denied. Father is not a party to this petition.

support network" than she had previously. Mother had become educated regarding Minor's medical condition.

Minor's pediatric gastroenterologist testified that it was necessary for Minor to have a stable home with someone capable of maintaining Minor's specific feeding needs. Mother had shown up to a minority of his appointments with Minor.

The PAM testified Minor had been placed with her and her husband on January 10, 2011. She was Minor's primary nurse in the neonatal intensive care unit since Minor was two to three weeks old until she was released at the age of 10 and a half months. The maternal great-grandparents had asked that the PAM consider caring for Minor because they were concerned about Minor's safety with Mother. During unsupervised visits with Mother, Minor returned with leakage problems from her J-tube. Minor called the prospective adoptive father "Papa" and introduced the PAPs as her "mommy" and "daddy."

Minor had fun during visits with Mother; they were "playmates." Mother visited consistently. Minor called Mother "Mom" or "Mommy."

The PAM initially supported reunification between Mother and Minor until the summer of 2012: "I had spent extensive time training [Mother], training Great Grandmother, putting in lots of time teaching and educating them while [Minor] had the [central line], what she needed to do, what care[] they needed to provide in order to keep [Minor] progressing forward, and it seemed that at whatever point, they decided that it wasn't important to do that . . . ."

21

The PAM described the process by which she fed and cleaned Minor via the J-tube. The PAM stated she would be concerned were the court to order unmonitored visitation with Mother because, "[a]fter almost two years of really hands-on training and explaining the rationale behind why I requested certain things to be done, it was unheeded, and [Minor] suffered as a result, and even though I don't expect anybody to be a nurse, I know parents who could very well follow directions and do what I ask them to do."

The PAM testified that over the past three and a half years she had allowed Mother almost "unlimited access to the home and [Minor] so I could train her. That was the objective. If she was there, then I could troubleshoot, and if something was done incorrect[ly], I could say, No, this is a better way of doing it." Mother had completed medically fragile training with respect to Minor, for which she received a certificate. The PAM discontinued training Mother on the care of the J-tube because Minor's medical status had been compromised during unsupervised visits and because the PAM believed there was no reasonable probability that Mother would ever have to do it again once visits were required to be supervised again.

The juvenile court found the LCSW's testimony credible. It called the psychologist's credibility into question. The court found changes in Mother's and Minor's circumstances: "This is a parent that, prior to termination, completed an entire case plan, including medically fragile training, extensive training that's documented from the current legal guardian, the PHN—parenting, counseling, everything was completed

22

since the termination, and prior to the termination . . . ." The court found it was in Minor's best interest to grant the petition.

The court ordered an evaluation of Mother's home, granted her six more months of reunification services, prohibited unauthorized contact with Father or Mother's boyfriend, and granted Mother six hours of unsupervised visitation weekly on weekends. The court authorized a transition to overnight and weekend visitation if appropriate. As part of Mother's reunification services, the court ordered conjoint counseling between Minor and Mother, a referral to a PHN for updated care of Minor's J-tube as directed by a doctor, and domestic violence counseling. The court vacated the section 366.26 hearing.[12]

On September 2, 2015, apparently in a family law matter, the court ordered visitation between Mother's eldest daughter and Mother to occur solely at the legal guardians' discretion due to Mother's bringing Father to visits.[13] Minor's elder sister had written a letter reflecting that she was exposed to Mother's boyfriends, who were "convicted felons and jailbirds," who were "dangerous," and the situation was forcing her to live "a nightmare in the darkness of the soul."

---

[12] On September 14, 2015, the PAPs filed a notice of appeal from the order granting Mother's section 388 petition. After the PAPs filed an opening brief, Mother filed a motion to dismiss the appeal as moot, as Mother's reunification services had been terminated again on May 2, 2016. On June 16, 2016, the PAPs filed a request to dismiss the appeal as moot. On June 27, 2016, we dismissed the appeal.

[13] Father is not the father of Mother's eldest daughter.

On November 16, 2015, the social worker filed an addendum report in which she, pursuant to the juvenile court's order, recommended that Mother receive six months of reunification services. A home evaluation revealed adequate space, working utilities, adequate food, and medical supplies for Minor. Mother completed J-tube training and a two-day medically fragile training. Mother had been participating in individual counseling with the LCSW during which she addressed domestic violence issues. Mother had been referred for conjoint counseling with Minor.

On March 1, 2016, the social worker filed a six-month status review report in which she recommended Mother's reunification services again be terminated and the section 366.26 hearing be rescheduled. The maternal great-grandparents, who were Mother's eldest daughter's legal guardians, conveyed Mother's eldest daughter's report of being afraid of Mother and Mother's boyfriends. The social worker reported that on December 23, 2015, Mother had filed for a restraining order against a third man, not Father or Mother's previously-referenced boyfriend, regarding a domestic violence incident which had later been dismissed due to Mother's failure to appear.[14] The conjoint therapist expressed concerns with Mother's ability to understand Minor's emotional and medical needs. When asked if she wished to spend more time with Mother, Minor said, "'no, thanks.'" The therapist recommended visits not be increased.

---

[14] An investigator hired by the PAPs later attached a copy of the request for a domestic violence restraining order to the PAPs' subsequently filed section 388 petition. The request reflects that the man, not Mother, requested the restraining order against Mother for stalking and verbally abusing him. The request indicated the two had previously dated.

On November 20, 2015, the court ordered the social worker to determine with the PHN if Mother required additional medical training. The PHN instructed Mother to practice the skills she had already learned and instructed her to schedule an assessment with the PHN once Mother was confident she could demonstrate her ability to appropriately care for Minor's medical needs on her own. As of February 24, 2016, Mother had not contacted the PHN to schedule the assessment. Mother visited consistently with Minor for six hours each Saturday; however, Minor expressed concerns regarding the visits and made statements suggesting she just wanted to get the visits over with.

On March 15, 2016, the PAPs filed a section 388 petition requesting the termination of unsupervised visitation. The PAM declared that Minor reported Mother had been improperly caring for her J-tube and forcing her to eat orally. Minor said she no longer wished to participate in the visits. An investigator had witnessed Father at Mother's apartment on numerous occasions.

The juvenile court held the hearing on the PAPs' section 388 petition on April 12, 27, and 28, and May 2, 2016. The social worker testified Mother had completed the J-tube training and a two-day medically fragile training, but had yet to complete the component of her medical training in which the PHN required her to demonstrate her hands-on ability to care for the J-tube. The conjoint therapist expressed numerous concerns regarding Mother.

During a face-to-face meeting with Mother on January 22, 2016, the social worker told Mother she would benefit from a domestic violence education course. As of February 5, 2016, Mother had contacted the service provider, but had not begun a domestic violence course; Mother said it was located too far from her residence. The social worker called to find domestic violence services closer to Mother, but none were available.

The social worker observed: "The most important thing . . . seems to be an ongoing[,] reoccurring issue in [M]other's life [of] less than positive relationships; that she's engaged in the domestic violence history, it is very concerning; ongoing domestic violence issues in her life." The social worker opined that Mother had not substantially benefitted from the extensive domestic violence services she had been provided. The social worker's opinion was based in part on the fact that a man had recently requested a restraining order against her and on Mother's contact with Father, who had been convicted of terrorist threats against her. The social worker also noted recent reports that Mother had been with Father in close proximity to Minor during visitation.

Mother testified that she had completed a parenting class and participated in individual counseling, both of which dealt with domestic violence issues. She had taken a several hour-long, high conflict coparenting class. Mother had taken one-on-one classes at LLMUC, a cardiopulmonary resuscitation class, and two days of medically fragile classes.

She did not complete the hands-on portion of the J-tube training because Minor was never made available to her; however, she was ready and willing to complete that training.

Mother testified that in January the social worker had asked her whether she had begun domestic violence classes. Mother responded that she had never received a referral for such services and would begin once she received such a referral. She requested a referral in Los Angeles County instead of Riverside County, but never received any referral. Mother further texted the social worker regarding the referral, but never received a response.

In 2006, Mother had dated the man who requested the recent restraining order. She filed a civil suit against him in October or November 2015. Mother had been to his work twice within the last year, but had not seen him in the past two years. Mother initiated contact with Father while he was incarcerated in federal prison out of state; she had frequent and regular telephone calls and e-mails with him while he was imprisoned. More recently, she had been in contact with Father, including having him at her home on a handful of occasions. Father had been convicted of terrorist threats against her. She had sustained injuries from Father as a result of violent, rough sex which had gone overboard.

The parties stipulated that Minor would testify she would like to continue to have visitation with Mother at the current rate with continued conjoint therapy. Minor had been afraid on two occasions during recent unsupervised visits when Mother left her

27

alone in the car. Minor did not wish to live with Mother; she wanted to stay at her home with the PAPs because she loved them.

The juvenile court found Mother's "testimony to be largely not credible." Mother's testimony "has been demonstrated—clearly demonstrated to the Court that the [M]other unfortunately does not understand the dynamics of domestic violence and the negative effect that domestic violence has upon children." The court found that the department had provided Mother reasonable services, but "that [M]other has not completed her services and has not benefitted from any of the services that she has received." The court terminated Mother's reunification services, set the section 366.26 hearing, and withdrew the PAPs' section 388 petition as moot.

## II. DISCUSSION

Mother contends the department failed to meet its burden to show that it provided her reasonable reunification services. We disagree.

"'The paramount goal in the initial phase of dependency proceedings is family reunification. [Citation.]' [Citation.] 'At a disposition hearing, the court may order reunification services to facilitate reunification between parent and child.' [Citation.] Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.] Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.' [Citation.]" *(In re T.G.* (2010) 188 Cal.App.4th 687, 696-697.)

28

The department "'must make a good faith effort to develop and implement a family reunification plan. [Citation.] "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.]' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] 'The applicable standard of review is sufficiency of the evidence. [Citation.]' [Citation.]" (*In re T.G., supra*, 188 Cal.App.4th at p. 697.)

In the instant case, Mother had nearly two years of reunification services before the juvenile court *first* terminated services. Mother completed domestic violence services and medical training aimed at caring for Minor during those two years. However, the juvenile court found Mother had not benefitted from those services and terminated her reunification services.

When the juvenile court subsequently granted Mother an additional six months of reunification services it specifically ordered medical training services for Mother, as advised by the PHN, aimed at helping Mother care for Minor and domestic violence services. The court also ordered visitation and conjoint counseling between Mother and Minor. Mother complains about the adequacy of the services, but fails to identify which

29

services the department failed to provide or which services that it did provide were inadequate.

Here, a social worker met Mother at Mother's home to conduct a home evaluation on September 14, 2015. That social worker informed Mother that her case plan included requirements that she enroll in individual counseling, conjoint counseling, medical training, and domestic violence classes. On the same date, the social worker contacted the PHN to arrange for Mother's medical training. The PHN gave the social worker a contact person with whom to arrange the training. The social worker contacted that individual and put Mother on the schedule for training. Mother engaged in consistent visitation with Minor; she completed J-tube training, medically fragile training, and a cardiopulmonary resuscitation course; participated in conjoint counseling with Minor; and participated in individual counseling in which she purportedly addressed domestic violence issues.

Despite the fact that Mother had been informed during her initial meeting with a social worker on September 14, 2015 that she was required to participate in domestic violence classes, Mother had still not done so as of January 22, 2016. During the face-to-face meeting on that date with the current social worker, the social worker told Mother she needed to participate in a domestic violence education course. Mother contacted the service provider, but did not begin the program because she said it was too far. The social worker attempted to find closer domestic violence services, but was unable to do

30

so.  Mother never completed a court-ordered domestic violence course during the last six months of services.

The PHN requested that Mother schedule an appointment with her once Mother felt competent to demonstrate her ability to care for Minor's medical needs as a final portion of Mother's requisite medical training.  However, Mother never called to schedule the appointment.  Thus, Mother never completed her court-ordered medical training

Mother complains that the *current* social worker only met with Mother once and that the "issue of alleged domestic violence . . . had no basis in fact and was merely a 'red herring.'"  Although the current social worker only met with Mother once, the previous social workers, on several occasions, met personally with, left messages for, and had telephonic contact with Mother during the preceding six months.  In addition to the in-person meeting the current social worker had with Mother, the current social worker also had several telephonic contacts with Mother.  Over the course of these contacts, the social workers discussed all aspects of Mother's case plan with her and gave her referrals for those services.

Moreover, the concern expressed regarding domestic violence issues was not a "red herring."  One of the original bases for jurisdiction was the finding that Mother had engaged in domestic violence with her then boyfriend in Minor's presence.  After that finding, Mother obtained a restraining order against the boyfriend when he kidnapped and assaulted her.  Despite this, Mother continued to have contact with the boyfriend,

reportedly including having him spend the night at her home. This contact eventually led her to report him to the police for threatening her. Mother still reportedly had contact with the boyfriend after that incident.

Father had initially been charged by felony complaint with assault by means of force likely to produce great bodily injury, criminal threats, and assault with intent to commit rape against Mother. Father pled guilty to the terrorist threat charge. Mother testified Father injured her.

Nevertheless, Mother continued to have contact with Father. She had frequent and regular telephone and e-mail contact with him while Father was in prison. After Father had been released from prison, Mother had had personal contact with Father on several occasions, including having him over to her house and meeting with him during her visitation with Minor. Mother characterized the injuries she had received from Father as the result of violent, rough sex which had gone overboard. Moreover, a third man filed a domestic violence restraining order against Mother during the last reporting period. Thus, there was sufficient evidence both for the original court to order domestic violence services as part of Mother's reunification services and for the later court to find that Mother had failed to complete her services and that Mother did "not understand the dynamics of domestic violence and the negative effect that domestic violence has upon children." Substantial evidence supported the juvenile court's termination of Mother's reunification services and the setting of the section 366.26 hearing.

## III.  DISPOSITION

The petition is denied.  The stay imposed by order of this court on August 25, 2016 is LIFTED.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
J.


We concur:

RAMIREZ
P. J.

SLOUGH
J.


33